IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **GLOBAL CASH NETWORK, INC.**, an Illinois Corporation,<br><br>            Plaintiff,<br><br>      v.<br><br>**WORLDPAY, US, INC.**, a Georgia Corporation, f/k/a, **RBS WORLDPAY, INC.**, a Georgia Corporation, f/k/a **LYNK SYSTEMS, INC.**, a Georgia Corporation,<br><br>            Defendant. | Case No. 15 C 5210 |

## MEMORANDUM OPINION AND ORDER

Worldpay, US, Inc. ("Worldpay") has filed a Fed. R. Civ. P. ("Rule") 12(b)(6) motion to dismiss portions of the Complaint brought against it by Global Cash Network, Inc. ("Global Cash"), and that motion has now been fully briefed by the parties and is accordingly ripe for decision. For the reasons that follow, the motion is granted.

### Motion To Dismiss Standards

Under Rule 12(b)(6) a party may move for dismissal for the "failure to state a claim upon which relief can be granted." Familiar Rule 12(b)(6) principles require the district court to accept as true all of Global Cash's well-pleaded factual allegations and view them in the light most favorable to it as the non-moving party (Lavalais v. Vill. of Melrose Park, 734 F.3d 629, 632 (7th Cir. 2013)). But "legal conclusions or conclusory allegations that merely recite a claim's elements" are not entitled to any presumption of truth (Munson v. Gaetz, 673 F.3d 630, 632 (7th Cir. 2012)).

In the past decade the Supreme Court made an important change in the evaluation of Rule 12(b)(6) motions via what this Court regularly refers to as the "Twombly-Iqbal canon," a usage drawn from Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), as more finely tuned in Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam), and Ashcroft v. Iqbal, 556 U.S. 662 (2009)). That canon has introduced the concept of "plausibility" into the analysis, and in that respect our Court of Appeals has "interpreted Twombly and Iqbal to require the plaintiff to provid[e] some specific facts to support the legal claims asserted in the complaint" (McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011) (internal quotation marks omitted)). As McCauley went on to reconfirm, claimants "must give enough details about the subject-matter of the case to present a story that holds together" (id.).

Because the focus of Rule 12(b)(6) motions is on the pleadings, they "can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" (Geinosky v. City of Chicago, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). But a nonmovant has more flexibility, for it "may elaborate on [its] factual allegations so long as the new elaborations are consistent with the pleadings" (id.). This opinion evaluates Worldpay's motion in accordance with those principles.

**Background**

Global Cash is an Illinois corporation that offers ATM and credit card processing services to merchants throughout the United States (Complaint ¶¶ 1, 5).[1] In 2003 Global Cash

---

[1] This opinion cites to allegations in the Complaint as "Complaint ¶ --." Memoranda filed by the parties are cited "Mem. --," "Resp. Mem. --" or "Reply Mem. --," with prefixes of "W." and "G." for Worldpay and Global Cash respectively.

entered into a Customer Referral Agreement with Lynk, a predecessor to Worldpay, under which Global Cash was to receive compensation for referring customers to Lynk's credit card-processing service (Complaint ¶ 17). Five years later Global Cash entered into a similar Customer Referral Agreement with Lynk's successor (and Worldpay's immediate predecessor), RBS Worldpay (Complaint ¶ 18). Finally, in 2014 Global Cash entered into a Customer Referral Agreement with Worldpay (Complaint ¶ 19).[2]

In late 2013 or early 2014 Global Cash conducted an audit and found that Worldpay had been shortchanging the company on referral fees due under the agreements to the tune of $15,000 to $30,000 per month going back to at least 2004 (Complaint ¶ 21). Global Cash brought this problem to Worldpay's attention, but Worldpay was largely unresponsive except to acknowledge that there were certain payment shortfalls and to claim that an investigation was ongoing (Complaint ¶¶ 22-24). Global Cash then filed this lawsuit.

Though the Complaint is woefully short of details on this point, Global Cash asserts that is also a "customer" of Worldpay (Complaint ¶ 57) in that it "routed its own ATMs through Worldpay" (G. Resp. Mem. 3).[3] Sometime in 2011 Global Cash employee Nicole Noelte ("Noelte") communicated with Worldpay and requested that Global Cash's president Lisa McGarry ("McGarry") be removed from a list of individuals who would receive notifications when settings were changed on a Global Cash ATM (Complaint ¶ 27). Worldpay complied with

_____

[2] For ease of reference, further references to Worldpay or any of its predecessor companies will refer simply to "Worldpay."

[3] To gain even a basic understanding of Global Cash's embezzlement-related claim, this Court has been required to stitch the allegations in the Complaint together with Global Cash's responsive memorandum, a practice that, while acceptable under Rule 12(b)(6) standards (see Geinosky, 675 F.3d at 745), would have been unnecessary if the Complaint had been more clearly pleaded.

that request and, with McGarry thus in the dark, Noelte changed the settings on the ATM so that funds would be routed to her personal account rather than to her employer's (Complaint ¶¶ 25, 28-29). It was not until 2013, after Noelte had already embezzled roughly $700,000, that Global Cash learned of the scheme (Complaint ¶ 29; G. Resp. Mem. 3).

## Analysis

Worldpay seeks the total dismissal of five of the Complaint's six counts and a partial dismissal of the sixth, the Count I charge sounding in breach of contract, as to which Worldpay seeks dismissal only of contentions that it asserts are time-barred. This opinion will consider each count in turn.[4]

**Count I: Breach of Contract**

This Court's October 1, 2015 memorandum order (Dkt. No. 23), considered in tandem with Global Cash's responsive memorandum, makes disposition of Count I straightforward: Global Cash has conceded (G. Resp. Mem. 2) that the applicable statute of limitations for breach of contract claims is six years under Georgia law (see Ga. Code Ann. § 9-3-24).[5] Global Cash's

---

[4] Global Cash's Complaint follows the too-common practice of splintering claims founded on a single transaction or occurrence into multiple "counts," each of which asserts a different theory of recovery -- see in that respect NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 291-92 (7th Cir. 1992). As will be seen, all of Counts I through IV arise out of the alleged underpayment of referral fees, while both Counts V and VI arise out of Worldpay's alleged failure to prevent Noelte's embezzlement. Although such treatment is at odds with the role of separate counts defined in the last sentence of Rule 10(b), the analysis that follows in this opinion is facilitated by treating the counts in accordance with how they have been framed by Global Cash.

[5] Worldpay and Global Cash agree that Counts I through IV, each of which relates to the alleged breach of the referral agreements, are governed by Georgia law. In light of the sensible teaching of Wood v. Mid-Valley Inc., 942 F.2d 425, 427 (7th Cir. 1991) that "[c]ourts do not worry about conflict of laws unless the parties disagree on which state's law applies," this opinion will honor the parties' agreement by applying Georgia law to Counts I through IV.

remaining argument that the 2003 contract was executed under seal and is therefore subject to a twenty-year statute of limitations has already been addressed and rejected in the October 1 order. That then means that Global Cash has no enforceable right of recovery for breach of contract as to any conduct predating June 12, 2009, and Count I is dismissed to that extent.[6]

**Count II: Conversion**

Global Cash's Count II, sounding in conversion, relies on the same set of facts that underpins Count I: the allegation that "Worldpay has wrongfully retained control of the payments that are due and owing to Global Cash . . ." (Complaint ¶ 38). That betrays a misunderstanding of the common law claim of conversion: Just as in Illinois, George law as stated in <u>Taylor v. Powertel, Inc.</u>, 551 S.E.2d 765, 769 (Ga. App. 2001) teaches:

> Tangible personalty or specific intangible property may be the subject for an action for conversion, but as fungible intangible personal property, money, generally, is not subject to a civil action for trover with an election for damages for its conversion.[7]

Moreover, a claim of conversion "does not lie on account of a mere failure to pay money due under a contract" (<u>Decatur Auto Ctr. v. Wachovia Bank, N.A.</u>, 583 S.E.2d 6, 9 n.8 (Ga.

---

[6] Because the statute of limitations is ordinarily an affirmative defense, it is unusual to dismiss a claim as time-barred under Rule 12(b)(6), but a plaintiff "can effectively plead[ ] [itself] out of court by alleging facts that are sufficient to establish the defense" (<u>Hollander v. Brown</u>, 457 F.3d 688, 691 n.1 (7th Cir. 2006)). In this instance the Complaint includes three dated contracts as well as an allegation that Global Cash has been underpaid "since at least 2004" (Complaint ¶ 5). Global Cash's pleadings therefore render the breach of contract theory of recovery vulnerable to partial dismissal on the ground of being time-barred.

[7] [Footnote by this Court] While <u>Taylor</u>, id. allows a narrow exception to that rule if the allegedly converted money "comprise[s] a specific, separate, identifiable fund," the fees that Worldpay allegedly withheld are not alleged to meet any of those requirements. Indeed, Global Cash does not even know how much it is allegedly due (Complaint ¶¶ 21, 42). But even if the withheld fees could be regarded as a separate fund, they are still owed pursuant to a contract and that is enough to defeat the claim.

2003) (internal quotation marks omitted)). As the property allegedly converted here is indeed money due under a contract, Global Cash's conversion theory flunks that second test as well. Hence Count II is dismissed.[8]

**Count III: Accounting**

In Count III Global Cash seeks an accounting to determine how much it is owed under the referral agreements. But Georgia law, as articulated in Gifford v. Jackson, 154 S.E.2d 224, 225 (Ga. 1967) (internal quotation marks omitted), makes it clear that:

> Equity will not take cognizance of a plain legal right, where an adequate and complete remedy is provided by law.

Gifford, id. went on to explain:

> The mere necessity of an accounting to ascertain the amount due on a contract is wholly insufficient to give equity jurisdiction to order an accounting.

Here Global Cash seeks an accounting only to determine the amount due under its contracts with Worldpay (Complaint ¶ 47). While such an accounting is alleged to be "extremely complicated" (id.), nothing in the Complaint -- beyond conclusory allegations[9] that cannot be credited -- supports the notion that ordinary discovery on Global Cash's breach of contract claim would not suffice.

Appearing to recognize that infirmity, Global Cash has retreated from its demand for an accounting by suggesting that the count be "stayed" pending a review of Worldpay's business

---

[8] Worldpay also argues that because the funds at issue never entered Global Cash's possession or control, the conversion claim must fail. In light of the just-completed analysis and conclusion, this opinion need not reach that issue.

[9] For example, Complaint ¶ 46 says that "Global Cash is in need of discovery from Worldpay that only an accounting can satisfy." But Global Cash never explains why that is so.

- 6 -

records (G. Resp. Mem. 3). Because no basis is advanced for doing so and no reason appears to support such a "stay," Count III must be and is dismissed as well.

**Count IV: Unjust Enrichment**

Global Cash has also retreated from its count sounding in unjust enrichment, which it acknowledges (G. Resp. Mem. 3) is defeated by the existence of valid contracts between the parties (see Reg'l Pacesetters, Inc. v. Halpern Enters., Inc., 300 S.E.2d 180, 185 (Ga. App. 1983)). Although Global Cash instead requests that this Court dismiss the count without prejudice, there is no suggestion that additional facts could be pleaded to save that theory of recovery. Hence Count IV must be and is dismissed too.

**Count V: Negligence**

Even when read in light of the forgiving standards of the federal system's notice pleading regime, Global Cash's negligence claim is extraordinarily vague. Global Cash has asserted that Worldpay's "wholly inadequate and negligent" security measures allowed Noelte to embezzle nearly $700,000 using a Global Cash ATM routed through Worldpay (Complaint ¶¶ 58-59; G. Resp. Mem. 6). But Global Cash has failed to explain even the most basic foundation for its negligence theory: the nature of the relationship between Global Cash and Worldpay that supposedly gave rise to Worldpay's asserted duty.[10]

_____
[10] Here is how that relationship is described in Complaint ¶ 57:

> As a customer of Worldpay, Worldpay owed Global Cash a duty to employ proper and reasonable security measures with regard to Global Cash's accounts.

That cannot of course mean that Worldpay is its own customer, as it literally reads. But even if the language were altered to state that that Global Cash is a Worldpay customer, the purported

<mark>(continued)</mark>

<mark>- 7 -</mark>

Although Worldpay's memorandum assumed (understandably, given the confused allegations in the Complaint) that the relationship sought to be relied on by Global Cash arose out of the referral agreements described earlier, Global Cash responded (G. Resp. Mem. 3, with emphasis in original) that its negligence claim "ha[s] nothing to do with the referral agreements . . .":

> Not only did Global Cash refer many customers to Worldpay, but Global Cash also was a <u>customer</u> of Worldpay's. Global Cash routed its own ATMs through Worldpay.

That hardly clarifies matters. How was Global Cash a customer of Worldpay? Was a contract in place? What does it mean to route ATMs through Worldpay?

Confusion about those basic questions has led to confusion about applicable law. Worldpay, assuming in its motion that Global Cash's negligence claim arose from the parties' contractual relationship, has argued that Georgia law applies (W. Mem. 10). Global Cash has responded that because its negligence claim is unrelated to the referral agreements, Illinois law applies (G. Resp. Mem. 6).

But this opinion need not pause to resolve that dispute. Under the "false conflict" doctrine no choice-of-law analysis has to be undertaken if courts in Georgia and Illinois would arrive at the same destination as to the controlling issues of law. As <u>Barron v. Ford Motor Co. of Canada Ltd.</u>, 965 F.2d 195, 197 (7th Cir. 1992) puts it:

> [B]efore entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the

---

(footnote continued)
reason for attaching that label to the parties' relationship (and hence for the duty purportedly owned by Worldpay) is left unexplained.

different states.

This Court applies that common sense rule here and finds that a choice-of-law analysis is unnecessary because the result would be identical under each state's law.

Both Georgia and Illinois bar negligence claims when the alleged loss is merely economic. Illinois' widely cited "Moorman doctrine" (Moorman Mfg. Co. v. Nat'l Tank Co., 91 Ill. 2d 69, 86, 435 N.E.2d 443, 450-51 (1982))[11] holds that parties to a commercial transaction cannot recover under a negligence theory for economic losses. In Georgia, Gen. Elec. Co. v. Lowe's Home Centers, Inc., 608 S.E.2d 636, 637 (Ga. 2005) similarly teaches:

> The "economic loss rule" generally provides that a contracting[12] party who suffers purely economic losses must seek his remedy in contract and not in tort.

Global Cash, looking to Illinois law, does not dispute the application of the economic loss doctrine, but it asserts that it "has suffered many noneconomic losses as a result of Worldpay's negligence . . ." (G. Resp. Mem. 4). In support of that assertion Global Cash cites (G. Resp. Mem. 4) its Complaint ¶ 59, which reads in relevant part (emphasis added):

> Worldpay's negligent security measures were a direct and proximate cause, as well as a substantial factor, in bringing about the damages suffered by Global

---

[11] Though the Moorman case itself concerned product sales, the economic loss doctrine also bars negligence claims involving services (see, e.g., Johnston v. Tri-City Blacktop, Inc., 217 Ill. App. 3d 388, 390, 577 N.E.2d 529, 531 (3d Dist. 1991), rejecting plaintiff's argument that the economic loss rule announced in Moorman was limited to matters involving products).

[12] For the reasons discussed earlier in this opinion, it is not clear whether Global Cash was a "customer" of Worldpay pursuant to a contract. But if that is so, Worldpay's basis for looking at Georgia law is that the referral agreements govern the relationship between the parties (W. Mem. 6 n.3). If Worldpay is right, then, the economic loss bar announced in Gen. Elec. Co. applies. If Worldpay is wrong and Illinois law applies, the result is the same: In this state the "Moorman doctrine" has been interpreted to extend beyond contracting parties and would therefore bar the claim regardless of whether the parties' relationship is contractual (see Anderson Elec. v. Ledbetter Erection Corp., 115 Ill. 2d 146, 153, 503 N.E.2d 246, 249 (1986)).

> Cash, including causing Global Cash a serious cash shortage which created a liquidity spiral that affected many other business interests that Global Cash was involved in and caused Global Cash and its affiliates to breach other material agreements <u>and other nonmonetary injury directly related to Worldpay's negligence</u>.

But the sole purported noneconomic loss referred to there -- "other nonmonetary injury" -- is a purely conclusory assertion that this Court cannot credit (<u>Munson v. Gaetz</u>, 673 F.3d 630, 632 (7th Cir. 2012)). With no nonmonetary loss adequately alleged, the economic loss doctrine as recognized in both Georgia and Illinois dooms Count V. It must be and is dismissed.[13]

**Count VI: Aiding and Abetting a Breach of Fiduciary Duty**

Count VI is predicated on the same fact that Global Cash relied on in advancing Count V -- Noelte's embezzlement. Here Complaint ¶ 66 alleges that Worldpay:

> knew or should have known that Ms. Noelte should not have been able to make this switch of ATM routing numbers, and therefore substantially assisted, Ms. Noelte's breaches of her fiduciary duties.

But Count VI fails under both Illinois and Georgia requirements for charging the aiding and abetting of a breach of fiduciary duty. <u>Thornwood, Inc. v. Jenner & Block</u>, 344 Ill. App. 3d 15, 27-28, 799 N.E.2d 756, 767 (1st Dist. 2003) (internal quotation marks omitted) lays out the elements of such a contention in Illinois:

> (1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

<u>Insight Tech., Inc. v. FreightCheck, LLC</u>, 633 S.E.2d 373, 379 (Ga. App. 2006) (internal footnotes omitted) similarly sets forth the elements under Georgia law:

---

[13] Worldpay also asserts that it owed no duty to Global Cash to prevent embezzlement by a Global Cash employee. That issue is addressed in the ensuing discussion of Count VI.

- 10 -

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Both states therefore require that the defendant (here Worldpay) knowingly assisted the fiduciary (here assertedly Noelte) in her breach of duty.

But Global Cash has not alleged that Worldpay knew of the embezzlement, let alone that Worldpay helped Noelte pull it off. All Global Cash has asserted is that Worldpay should have known that it was improper for Noelte to switch the routing number. And knowing that embezzlement is improper (and who does not?) is a far cry from knowingly assisting with embezzlement, as both Georgia and Illinois require.

Global Pay does not really dispute that its Complaint fails under the <u>Thornwood</u> and <u>Insight Tech.</u> analyses described in the preceding paragraphs. Instead it attempts to seek refuge in Section 876 of the Restatement (Second) of Torts (1979) ("Section 876"), which controls recovery under the related theory of concert of action in Illinois (<u>Thornwood</u>, 344 Ill. App. 3d at 28, 799 N.E.2d at 767-68).[14] Section 876 defines in-concert liability this way:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> > (a) does a tortious act in concert with the other or pursuant to a common design with him, or

---

[14] Neither party has discussed whether Section 876 has been followed in Georgia. But because the application of Section 876 cannot -- as will be seen -- save Count VI from dismissal, that question need not be addressed.

> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

With the first two of those three alternatives clearly inapplicable, Global Cash tries to hang its hat on Section 876(c), which represents a significant departure from traditional aiding and abetting liability in that it does not require a defendant to have knowledge of the tort. But critically, Section 876(c) retains both (1) the requirement that the defendant's own separately considered conduct is a breach of duty to the plaintiff (the problems on that score in this case have already been explored in the earlier discussion) and (2) the requirement that the defendant "give[ ] substantial assistance" to the primary tortfeasor.

In both of those respects, Comment e to Section 876(c) (excerpted here in relevant part) sheds light on that subsection's meaning:

> When one personally participates in causing a particular result in accordance with an agreement with another, he is responsible for the result of the united effort if his act, considered by itself, constitutes a breach of duty and is a substantial factor in causing the result, irrespective of his knowledge that his act or the act of the other is tortious.

That is, even if the defendant is unaware that it or the "other" is acting tortiously, the defendant must still be acting according to an "agreement with another" and in a "united effort" to commit the tort.

That is consistent with what appears to be the only Illinois decision evaluating a claim under Section 876(c), <u>Norman v. Brandt</u>, 397 Ill. App. 3d 1074, 929 N.E.2d 14 (4th Dist. 2010). <u>Norman</u>, <u>id.</u> at 1083, 929 N.E.2d at 22 rejected liability under Section 876(c) on the ground that

the defendant and primary tortfeasor "were not prosecuting a joint enterprise to commit a tort."[15] Global Cash's contention in this case can and should be rejected on the same ground: Worldpay's alleged misconduct -- its failure "to employ proper and reasonable security measures" (Complaint ¶ 57) -- is not alleged to have resulted from an "agreement" (Section 876(c), comment e), a "united effort" (id.), a "joint enterprise" (Norman, 929 N.E.2d at 21) or anything close to those relationships with Noelte. That surely defeats recovery under Section 876(c).

While Global Cash's failure to allege adequately "substantial assistance" is a clear bar to recovery, a more difficult question emerges concerning whether Section 876(c) requires the defendant to have itself a committed a tort, which would constitute an additional (and therefore unnecessary) ground for dismissal. Justice Robert Cook's concurring opinion in Winters v. Wangler, 386 Ill. App. 3d 788, 796, 898 N.E.2d 776, 782-83 (4th Dist. 2008) (emphasis added) answered that question in the affirmative when it paraphrased Section 876(c) in these terms:

> [A] person is liable for harm resulting to a third from the tortious conduct of another when . . . one party's act substantially assisted another to commit a tort and that party's action by itself could have constituted a tort.

And that is consistent with the Restatement comment quoted in the preceding paragraph, which appears to assume that the defendant's conduct is itself tortious ("irrespective of his knowledge that his act or the act of the other is tortious.").

---

[15] While Norman is the only reported Illinois decision interpreting Section 876(c), other Illinois courts have analyzed "substantial assistance or encouragement" under Section 876 generally. For example, Rogers v. Reagan, 355 Ill. App. 3d 527, 533, 823 N.E.2d 1016, 1020 (1st Dist. 2005) (internal citation and quotation marks omitted) explains that to be liable under Section 876, the defendant's conduct "must be more than benign. The defendant must actively participate in the tortious conduct of another." That is consistent with Norman.

- 13 -

But those statements do not track the plain language of Section 876(c), which requires only that the defendant breached a duty to a third party. They are also inconsistent with the historic (though limited) application of the doctrine to hold multiple wrongdoers liable when the wrongdoer that actually caused the injury cannot be pinpointed (a defect that would defeat a traditional negligence claim) (see E. Dana Neacsu, <u>Concert of Action by Substantial Assistance: What Ever Happened to Unconscious Aiding and Abetting?</u>, 16 Touro L. Rev. 25, 31-32 (1999)).[16]

Here Global Cash relies on its negligence claim to assert that Worldpay breached a duty under Section 876(c) (G. Resp. Mem. 5), but for reasons already discussed its negligence claim is barred by the economic loss doctrine. That makes the issue raised in the preceding paragraph more than abstract: Could Worldpay have breached a duty to Global Cash even if its conduct was not legally negligent? Stated differently, does the economic loss doctrine knock out each element of negligence (i.e. duty, breach, causation and injury) or only the most obvious -- that is, injury?

---

[16] Interestingly, the Neacsu law review article contradicts itself on the issue of whether Section 876(c) requires the defendant to have committed tortious conduct. Here, <u>id.</u> at 29 (emphasis added) is its initial description of Section 876(c):

> The other area is also the third branch of concerted action: liability <u>due to tortious conduct</u> substantially assisting another's injurious acts without knowledge of that other's tortious conduct, which can be accurately characterized as unconscious or unknowing aiding and abetting.

And here is its contrary assessment five pages later (<u>id.</u> at 34):

> Clearly, the Restatement subsection (c), unconscious aiding and abetting liability, demands only a breach of duty, not necessarily tortious conduct.

On that score, courts in both Illinois and Georgia have concluded that the economic loss doctrine is conceptually rooted in concepts of duty. Here is how that is explained in <u>2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.</u>, 136 Ill. 2d 302, 314, 555 N.E.2d 346, 351 (1990) (internal citations omitted and emphasis added):

> It has been suggested that the court in <u>Moorman</u> did not explicitly base its holding on the concept of duty, and that the uncertainty over the scope of the decision and its application to claims such as those for professional malpractice may be traced to the absence of that conceptual foundation. We do not agree that such a foundation is lacking. <u>It would appear that the concept of duty is at the heart of the distinction drawn by the economic loss rule.</u>[17]

That opinion, <u>id.</u> at 314-15, 555 N.E.2d at 351-52 went on to list various decisions carving out exceptions to the doctrine and concluded:

> The principle common to those decisions is that the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred.

That analysis is mirrored in Georgia, where <u>Flintkote Co. v. Dravo Corp.</u>, 678 F.2d 942, 948 (11th Cir. 1982)[18] explained:

> The [economic loss] rule acts as a shorthand means of determining whether a plaintiff is suing for injuries arising from the breach of a contractual duty to produce a product that conforms in terms of quality or performance to the parties['] expectations or whether the plaintiff seeks to recover for injuries resulting from the breach of the duty arising independently of the contract to produce a nonhazardous product that does not pose an unreasonable risk of injury

---

[17] [Footnote by this Court] Another useful analysis of that concept can be found in <u>Am. Xyrofin, Inc. v. Allis-Chalmers Corp.</u>, 230 Ill. App. 3d 662, 669-70, 595 N.E.2d 650, 656 (2d Dist. 1992):

> The key determination [in evaluating whether to apply the economic loss doctrine], therefore, is whether the type of loss suffered is best resolved by the risk/responsibility allocations of contract/warranty law, or whether the defendants owed a duty to protect persons and property from harm thus invoking the safety/insurance policies of tort law.

[18] By sheer coincidence, the <u>2314 Lincoln</u> opinion includes an extensive quotation from <u>Flintkote</u> in the course of analyzing the conceptual basis for the economic loss doctrine.

to person or property. The economic loss rule prevents recovery in tort when a defective product has resulted in the loss of the value or use of the thing sold, or the cost of repairing it. Under such circumstances, the duty breached is generally a contractual one and the plaintiff is merely suing for the benefit of his bargain. The rule does not prevent a tort action to recover for injury to other property and persons because the duty breached generally arises independent of the contract. Nor does it preclude recovery for damages to the defective product itself, where the injury resulted from an accident.

Though Flintkote Co., unlike the 2314 Lincoln Park opinion, was discussing product liability, both decisions have employed a similar conception of the economic loss doctrine as one based on whether the defendant's duties were essentially contractual or whether they arose independently. And in both jurisdictions a purely economic loss is treated as a useful proxy for duties that, barring certain exceptions, are better allocated by contract than by tort.

In terms of this case, it would appear that the economic loss doctrine dictates that Worldpay, as a provider of commercial services to Global Cash, did not owe Global Cash a duty to protect it against economic loss because such a duty is more aptly governed by contract. And if that is the case, Global Cash has failed to state a basis for liability under Section 876(c) regardless of whether that provision requires tortious conduct or merely a breach of duty. In any event, because Count VI has already been held dismissable on the clear grounds discussed earlier, any issues raised here need not be resolved anyway.

## Conclusion

For the reasons set forth at length in this opinion, Count I is dismissed at to asserted harms sustained before June 12, 2009, while Counts II, III, IV, V and VI are dismissed in their entirety. That outcome must be viewed as ironic, because Global Cash has advanced only one "claim for relief" (the operative concept in federal jurisprudence under Rule 8(a)) to begin with, so that the splintering of that claim into many separate counts predicated on different theories of

liability might well be viewed as a waste of lawyers' and judicial time and clients' money -- all better spent in moving the case toward trial on the merits. This action is set for a status hearing at 8:45 a.m. December 14, 2015 to discuss the latter subject.

                                                     _____
                                                     Milton I. Shadur
                                                     Senior United States District Judge

Date: December 7, 2015